UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:23-CV-00117-GNS-HBB

MATTHEW B. IRVIN PLAINTIFF

v.

BOWLING GREEN POLICE DEPARTMENT et al. DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 31). The motion is ripe for adjudication. For the reasons that follow, the motion is **GRANTED**.

## I. STATEMENT OF FACTS AND CLAIMS

Defendant Bowling Green Police Department ("BGPD") hired Plaintiff Michael Irvin ("Irvin") as a police officer in 2015. (Irvin Dep. 22:16, Apr. 29, 2025, DN 32). The events which give rise to Irvin's claims unfolded over the course of several years between 2020 and 2023. He was eventually transferred to the Criminal Investigations Division ("CID") for a time to serve as a detective before being transferred back to patrol duty at the end of 2022. (Irvin Dep. 23:8-22). In 2020, while Irvin was in the CID, Detective Alex Wright ("Wright") shared to a work group text thread a picture of fellow Detective Richard Bessette ("Bessette") wearing a white paper mask with the eye holes cut out. (Irvin Dep. 30:21-32:12). Irvin saw the picture and understood this mask to be a reference to the Klu Klux Klan. (Irvin Dep. 31:7-9). Then in late 2020, a detective co-worker commented on a mugshot of a Black male suspect stating he looked like he was "sweating grease." (Irvin Dep. 42:16-24).[1] Finally in early 2021, a few months after the mask incident, Detective Sean Johnson ("Johnson") hung printed

[1] Throughout the record, other possibly racially charged occurrences are discussed, including detectives acting out a skit making fun of African American names, and comments regarding Irvin's hair. Despite these events apparently occurring before the Amended Complaint was filed, they are not discussed anywhere in the Complaint, nor is there a general allegation of other potential hostile occurrences. The Complaint is devoid of any reference to these events.

rap lyrics to a dry erase board in plain view in the communal area of the CID offices. (Irvin Dep. 36:14-37:21). These lyrics were not written by Johnson but were instead part of an ongoing investigation and contained racial slurs throughout, to which Irvin took offense. (Irvin Dep. 37:11-21).

In response, Irvin brought a complaint regarding at least some of these events to the BGPD Chief Mike Delaney ("Delaney"). When Delaney received the complaint regarding the mask picture and the rap lyrics in January 2021, he immediately opened an internal investigation. (Delaney Dep. 58:7-8, 67:11-16, Jan. 9, 2026, DN 33; Irvin Dep. 34:20-35:10).[2] Major Charles Casey ("Casey") was put in charge of the investigation, and every CID employee was interviewed. (Delaney Dep. 65:8-10; Irvin Dep. 38:20-23). At the close of the investigation, it was concluded that Bessette and Wright were responsible for the mask picture and Detective Sean Johnson was responsible for displaying the offensive rap lyrics. (Defs.' Mot. Summ. J. Ex. E, at 1, DN 31-5; Defs.' Mot. Summ. J. Ex. H, at 1, DN 31-8; Defs.' Mot. Summ. J. Ex. J, at 1, DN 31-10). As punishment, each of the detectives were suspended for five days without pay and all three were required to complete additional remedial training and cultural sensitivity counseling. (Irvin Dep. 36:6-10; Defs.' Mot. Summ. J. Ex. E, at 1; Defs.' Mot. Summ. J. Ex. H, at 1; Defs.' Mot. Summ. J. Ex. J, at 1). The investigation also determined

[2] In his response, Irvin vigorously contends that BGPD was notified of the offensive events months before any action was taken. (Pl.'s Resp. Defs.' Mot. Summ. J. 16-18, DN 38). He states that "[i]n October 2020, in person, Plaintiff went to Chief Delaney about these issues, but Chief Delaney refused to speak to Plaintiff about them." (Pl.'s Resp. Defs.' Mot. Summ. J. 16 n.36). This contention is not supported by any reference to the record. Indeed, Irvin does not cite the record when making this and other similar allegations about the timing of complaints and investigations. Not only do neither Irvin nor Delaney mention this attempted October 2020 meeting or any other earlier complaint in their depositions, but in response to an interrogatory requesting Irvin to "describe what actions you took to report/remedy each of the allegations in your complaint, to whom you reported each of these allegations, the date you reported each allegation, and the outcome of each," Irvin responded only that "[t]he Plaintiff reported the incidents to the administration and an internal investigation was conducted." (Irvin Dep. Ex. 8, Apr. 28, 2025, DN 32). He makes no mention of any ignored complaints. Furthermore, Irvin's attorney asked Delaney in his deposition "[Irvin's] *first* complaint of racial discrimination with the KKK image was in January of 2021, right?" (Delaney Dep. 67:11-13). To which Delaney answered, "I believe it was January, 2021 when I was made aware of that." (Delaney Dep. 67:15-16). There is no factual support in the record that a complaint of racial discrimination was brought to the attention of the BGPD administration before January 2021.

that Detective Mike Nade ("Nade") had made some comments to Irvin about his African American hairstyle, however, these comments were "jovial" according to Nade. (Defs.' Mot. Summ. J. Ex. C, at 62, DN 31-3). Nade claimed that he and Irvin were "good friends," and Nade was ultimately not punished.[3] (Defs.' Mot. Summ. J. Ex. C, at 62). The remaining comment regarding a Black suspect "sweating grease" was not investigated.

Irvin was put on a performance improvement plan ("PIP") in August 2021, several months after filing an EEOC complaint and reporting the misconduct to Delaney, though he was given a pay raise in July 2021. (Delaney Dep. 68:23-25; Irvin Dep. 50:6-8). This PIP was in response to an employment evaluation giving Irvin a "needs improvement" rating in the teamwork category. (Irvin Dep. 48:20-23; Delaney Dep. 62:17-23; Gleitz Dep. 71:20-72:3, Jan. 9, 2026, DN 36). Irvin remained on the PIP for fifteen months until November 2022, which was an unusually long time for a PIP to last. (Gleitz Dep. 71:7-17, 73:22-74:4). During his time on the PIP, Irvin did not improve his teamwork skills, which resulted in the PIP being continually extended. (Defs.' Mot. Summ. J. Ex. M, at 18, DN 31-13; Delaney Dep. 45:1-11). In his 2022 performance evaluation, Irvin once again received a "needs improvement" rating in the teamwork category. (Defs.' Mot. Summ. J. Ex. N, at 2, DN 31-14). Around this same time, the Commonwealth Attorney requested that Irvin not be assigned to work on serious felony cases due to a loss of confidence in his investigative and testimonial abilities. (Bumgarner Aff. ¶ 4, Mar. 12, 2026, DN 31-16). Ultimately, due to a failure to meet the PIP goals and a loss of confidence by the local Commonwealth Attorney's Office, Irvin was reassigned to patrol in November 2022. (Defs.' Mot. Summ. J. Ex. O, at 1, DN 31-15). This reassignment did not result in any loss of pay or rank. (Defs.' Mot. Summ. J. Ex. O, at 1; Delaney Dep. 54:22-23).

[3] There is some discrepancy in the record over who made the offensive comments to Irvin about his hair. BGPD's investigation concluded that it was Detective Nade. Irvin testified it was Captain Jason Scott, while Delaney stated it was Casey. (Irvin Dep. 45:1-24; Delaney Dep. 65:8-66:7).

Shortly after his reassignment, Irvin was placed on modified duty in December 2022 due to a back injury he sustained while participating in military training. (Irvin Dep. 85:5-11). Irvin was on modified duty for roughly six months. (Irvin Dep. 85:17-18). During this time, he was prevented from shooting his sniper rifle at the practice range, utilizing the department gym, and accessing the time clock app. (Irvin Dep. 86:4-11, 88:22-89:3, 87:23-88:14). Despite the broadly applicable rule that officers on modified duty could not use the shooting range, Irvin claims a Caucasian officer used the range while on modified duty. (Irvin Dep. 86:7-14). Furthermore, Irvin was reprimanded for taking his lunch break at the end of his shift, despite other officers doing the same, though the policy preventing this practice changed at some point. (Irvin Dep. 87:2-22; Vickous Dep. 60:19-61:11, Nov. 5, 2025, DN 35). Finally in May 2023, shortly after returning from modified duty, Irvin was prevented from flying drones until he completed his return to duty training, despite another officer allegedly being allowed to fly drones while in a cast. (Irvin Dep. 90:3-12).

Following these events, Irvin filed suit in Warren Circuit Court in June 2023, alleging discrimination and retaliation claims against BGPD and various other supervisory employees. (Compl. ¶¶ 2-6, 29-35, DN 1-2). The case was timely removed to this Court. (Notice Removal 1, DN 3).

## II. JURISDICTION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because a federal question has been presented based on the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e. In addition, the Court has supplemental jurisdiction over Irvin's state law claims. *See* 28 U.S.C. § 1367(a).

## III. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The

essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The movant has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

After the movant either shows "that there is an absence of evidence to support the nonmoving party's case[,]" or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial. *See id.* at 325; *Anderson*, 477 U.S. at 247-48. While the Court must view the evidence in a light most favorable to the non-moving party, it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by 'citing to particular parts of materials in the record' or by 'showing that the materials cited do not establish the absence . . . of a genuine dispute[.]'" *Burlington Ins. Co. v. Greenwood Rollerdrome, Inc.*, 420 F. Supp. 3d 632, 641 (W.D. Ky. 2019) (alterations in original) (quoting *Shreve v. Franklin Cnty.*, 743 F.3d 126, 136 (6th Cir. 2014)). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] [] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

### A. Official and individual capacity claims

Irvin first brings official and individual capacity claims against Delaney, Johnathan Vickous, Geoff Gleitz, and Mike Elliott, all of whom are employees of BGPD. Individual employees and supervisors do not themselves qualify as an "employer" and may not be held personally liable under either Title VII or KRS Chapter 344. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997). Irvin has recognized this and has conceded that the individual claims must be dismissed. (Pl.'s Resp. Defs.' Mot. Summ. J. 15 n.32). Additionally, the official capacity suits are duplicative of the suit

against BGPD itself. "District courts in the Sixth Circuit generally dismiss official capacity suits alleging Title VII violations where the suit would be redundant and duplicative of the suit against the [government] entity." *Watson v. Boone Cnty. Sch. Dist.*, No. 23-93-DLB-CJS, 2023 WL 8420934, at *5 (E.D. Ky. Dec. 4, 2023) (internal quotation marks omitted). Irvin has also conceded that his official capacity claims should be dismissed. (Pl.'s Resp. Defs.' Mot. Summ. J. 15 n.32).

**B. <u>Retaliation</u>**

Irvin next brings a claim against BGPD for retaliation, pursuant to KRS 344.280, alleging that he was retaliated against for his reports of racial discrimination at BGPD. (Am. Compl. ¶¶ 29-32). KRS 344.280 makes it unlawful to "retaliate or discriminate. . . against a person because he has opposed a practice declared unlawful by [the Kentucky Civil Rights Act ("KCRA")], or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under [the KCRA]." *Id.* To establish a prima facie claim of retaliation under Kentucky law, Irvin must show that: "1) [he] engaged in a protected activity, 2) [he] was disadvantaged by an act of [his] employer, and 3) there was a causal connection between the activity engaged in and the employer's act." *Ky. Ctr. for the Arts v. Handley*, 827 S.W.2d 697, 701 (Ky. App. 1991) (citation omitted). "The burden of establishing a *prima facie* case in a retaliation action is not onerous . . . ." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citation omitted). The civil rights provisions of the KCRA are interpreted consistently with the analogous federal anti-discrimination statutes and Kentucky courts frequently rely on federal case law when deciding issues under KRS Chapter 344. *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 575 (Ky. 2016) (citations omitted).

When a claim of retaliation relies on indirect evidence, as Irvin concedes his does, Federal and Kentucky courts apply the *McDonnell Douglas* burden shifting framework. (Pl.'s Resp. Defs.' Mot. Summ. J. 20); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Ky. Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 134 (Ky. 2003). Once the plaintiff establishes the prima facie case,

the burden shifts to the defendant employer "to offer a 'legitimate, non-discriminatory or retaliatory reason' for the adverse employment action." *Palmer v. Scripps Media, Inc.*, 823 F. Supp. 3d 739, 750 (E.D. Mich. 2026) (quoting *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020)). Plaintiffs may still prevail if they can establish that the employer's reasons are merely pretextual. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888-89 (6th Cir. 2020).

The first element of Irvin's prima facie case is undisputed. Irvin engaged in protected activity by bringing his complaints to the attention of his supervisors and filing complaints with the EEOC. (Irvin Dep. Ex. 8); *see Arredondo v. Beer Barrel Inc.*, 645 F. Supp. 3d 739, 754 (N.D. Ohio 2022) ("A complaint to management about discriminatory employment practices can constitute protected activity." (citation omitted)). BGPD argues that Irvin has failed to satisfy the second element, that he suffered an adverse employment action and was disadvantaged by that action. In the alternative, even if he has established a prima facie case, BGPD offers a legitimate non-discriminatory reason for the action.

**1. *Adverse Employment Action***

To show that he suffered an adverse employment action, Irvin must show that he suffered "a materially adverse change in the terms and conditions of his employment . . . ." *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999). This materially adverse change may include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Burlington N. Santa Fe R. Co.*, 364 F.3d 789, 798 (6th Cir. 2004) (internal quotation marks omitted) (citation omitted). "A 'mere inconvenience or an alteration of job responsibilities' or a 'bruised ego' is not enough to constitute an adverse employment action." *Id.* at 797 (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)). Irvin lists a plethora of alleged adverse employment actions, stating:

> Defendants retaliatory actions . . . included immediately placing Plaintiff on a "coaching PIP program", did not allow Plaintiff to properly train as needed in his job, did not allow Plaintiff to train new recruits, required Plaintiff to go back to CRT training when returning from a medical issue, harassed Plaintiff about his time clock—taking away access, transferred Plaintiff from being a detective and a member of the CID back to being a patrol officer, and Plaintiff has been passed up for or not allowed to be promoted in 2024 and 2025.[4]

(Pl.'s Resp. Defs.' Mot. Summ. J. 19). Irvin provides no record citations to support these asserted adverse employment actions—a critical part of his burden in a summary judgment response. *See Burlington Ins. Co.*, 420 F. Supp. 3d at 641. "[I]t is not the court's job to go looking through the voluminous record to find support for [his] arguments on [his] behalf." *Huston v. Autokiniton*, No. 23-13070, 2026 WL 736759, at *17 (E.D. Mich. Mar. 16, 2026) (citations omitted); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

Regardless, as a threshold matter, several of these actions are not "materially adverse change[s] in the terms of . . . employment." *White*, 364 F.3d at 797 (citation omitted). Harassment about a time clock is not an employment action. Removing access to the time clock app while on modified duty and instead requiring clocking in and out at the station is nothing more than an inconvenience. *See Kocsis*, 97 F.3d at 886; (Irvin Dep. 88:1-18). Failing to provide training is only an adverse employment action if it results in "any demotion, loss of pay, loss of responsibility, or other materially adverse effect. . . . [The] mere denial of a supplemental training . . . is not an adverse employment action." *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 567 (6th Cir. 2012) (citation omitted).

[4] In addition to this list, Irvin also alleges in his Amended Complaint that he suffered an adverse employment action in the form of negative performance reviews. (Am. Compl. ¶ 18). "[A] negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007) (citing *Hollins*, 188 F.3d at 662). Irvin has nowhere alleged or offered proof of a loss of wages or salary due to his performance reviews. In fact, his performance reviews rated him "FULLY COMPETENT" in 2021 and 2022, and there is no indication that these reviews were less favorable than previous evaluations. (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 3, at 4, DN 38-3; Defs.' Mot. Summ. J. Ex. N, at 8).

While Irvin vaguely asserts that the listed adverse employment actions have "caused Plaintiff to lose pay, proper training, a prohibited changing of work assignments . . . , and Plaintiff [was] [] continuously punished and retaliated against as shown by his disapproval with the promotions process in 2025[,]" he fails to cite to any evidence in the record supporting these claims. (Pl.'s Resp. Defs.' Mot. Summ. J. 19-20). It is likewise unclear how the *requirement* of training could be an adverse employment action without some evidence of a materially adverse effect.[5]

Finally, the issue of denied promotions and opportunities to train new officers for extra pay are not mentioned in the Amended Complaint. While the alleged promotion denials occurred after the First Amended Complaint was filed, the Complaint was never amended again to add these claims. Failure to promote is another unique Title VII discrimination claim, requiring its own prima facie case, which Irvin has made no effort to establish. *See Nguyen*, 229 F.3d at 562-63 (defining the elements of a failure to promote case). "[A] plaintiff may not defeat summary judgment by asserting a claim that he did not plead in the complaint." *Edison v. Twp. of Northville*, 752 F. Supp. 3d 808, 821 (E.D. Mich. 2024) (quoting *Spengler v. Worthington Cylinders*, 514 F. Supp. 2d 1011, 1017 (S.D. Ohio 2007)).

This leaves only two potentially adverse employment actions: placing Irvin on a PIP and transferring him out of the CID back to patrol. "[A] decision to transfer ordinarily does not constitute an adverse employment action where the reassignment does not result in any loss in prestige or pay . . . ." *Perry v. AutoZoners, LLC*, 948 F. Supp. 2d 778, 788 (W.D. Ky.) (citing *Kocsis*, 97 F.3d at 886). The Sixth Circuit has, however, once before found that reassignment from detective to patrol officer qualified as an adverse employment action, stating:

> First, we believe that Virostek established that her reassignment to the patrol officer position was an adverse employment action. At trial, Virostek presented evidence showing that, although her wages stayed the same after the reassignment, her duties materially changed in a manner that seriously impacted the conditions of her

[5] In addition to Irvin not explaining the adverse effect he suffered due to this required CRT training, there is no evidence that this training even occurred. Irvin provides no citation to the record in his response.

> employment. *See Kocsis*, 97 F.3d at 885 (suggesting that reassignments with material work changes may constitute adverse employment actions). Specifically, Virostek presented evidence showing that the duties of a patrol officer required more dangerous and physical duties than those of a detective and involved less paper work and fewer "intellectual" tasks than senior police officers generally desire.

*Virostek v. Liberty Twp. Police Dep't/Trs.*, 14 F. App'x 493, 511 (6th Cir. 2001). Irvin does not point to any evidence similar to that in *Virostek*, but nonetheless, a reasonable jury could infer that Irvin suffered some of the same material work changes due to his reassignment, in addition to a loss of prestige from no longer being a detective, which could potentially constitute an adverse employment action.[6]

Furthermore, while placement on a PIP does not constitute an adverse employment action on its own, PIP may become one if it informs another action which is itself adverse. *Giron v. Tyco Elecs. Corp.*, 762 F. App'x 233, 237 (6th Cir. 2019) (citation omitted). In the reassignment memorandum sent to Irvin, Delaney references Irvin's PIP and his failures to meet the plan's goals as a reason for the transfer. (Defs.' Mot. Summ. J. Ex. O, at 1). While Irvin was not terminated following the PIP placement, as in *Giron*, he was transferred to a potentially less favorable work assignment. *See Giron*, 762 F. App'x at 236. Viewing the facts in favor of Irvin, a jury could reasonably infer that his fifteen-month PIP was an adverse employment action.

### 2. *Legitimate Non-Discriminatory Reasons*

The prima facie case having been established, the burden then shifts to BGPD to articulate some legitimate, non-discriminatory, and non-retaliatory reason for the adverse employment actions.

---

[6] In his response, instead of citing the facts and circumstances which could constitute a material work change, Irvin relies on the City of Bowling Green's personnel policy. (Pl.'s Resp. Defs.' Mot. Summ. J. 12 n.44). That policy "prohibits retaliation against employees who, in good faith, make a complaint of (sic) participate in the complaint process." (Pl.'s Resp. Defs.' Mot. Summ. J. 12 n.44). Among the prohibited retaliatory actions is "changing work assignments." (Pl.'s Resp. Defs.' Mot. Summ. J. 12 n.44). Unlike *Hall v. Rag-O-Rama, LLC*, No. 20-6059, 2021 WL 5782381 (6th Cir. Dec. 7, 2021), the case Irvin cites in support of his argument, this is not a breach of contract case. The terms of the City of Bowling Green's Personnel Policy and Procedures Manual do not define an adverse employment action under state or federal law.

BGPD does so by pointing primarily to two pieces of evidence. First, Irvin's lengthy PIP during which he failed to improve his teamwork abilities, a necessary skill for work in the CID, and on multiple occasions engaged in investigation practices which were explicitly prohibited by going on suspect interviews alone or bringing unqualified patrol officers with him. (Defs.' Mot. Summ. J. 22; Defs.' Mot. Summ. J. Ex. M, at 18). Second, BGPD points to the Commonwealth Attorney's request that Irvin not be assigned serious felony cases due to the prosecutor's lack of confidence in Irvin's abilities. (Bumgarner Aff. ¶ 4). Poor performance by an employee and a repeated failure to improve despite counseling and assistance by the employer is a legitimate, non-discriminatory, and non-retaliatory reason for an adverse employment action. *See Johnson v. Fifth Third Bank*, 685 F. App'x 379, 385 (6th Cir. 2017).

**3. *Pretext***

BGPD having articulated legitimate non-discriminatory and non-retaliatory reasons for its decisions, the burden shifts back to Irvin to show that these reasons are a mere pretext. "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted). "[T]he employee also must offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citation omitted).

When an employer points to a particularized set of facts upon which its decision reasonably relied, it is entitled to a great deal of deference, even if that decision "is later shown to be mistaken, foolish, trivial, or baseless." *Id.* at 531 (internal quotation marks omitted) (citation omitted). The "key inquiry . . . is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (internal quotation marks omitted) (citation omitted). To defeat a summary judgment motion

when an employer has pointed to the facts which reasonably informed its considered decision, "the [employee] must produce sufficient evidence from which the jury could reasonably reject [the employer's] explanation and infer that the [employer] . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Tingle*, 692 F.3d at 531 (internal quotation marks omitted) (citation omitted).

Irvin has presented no such evidence, and the premise of his pretext argument is not entirely clear. He largely restates his prima facie case, without citations to the record, alleging that because he was the only member of the CID placed on a PIP, and the only African American detective at the time, his differential treatment was discriminatory and therefore any offered explanation is inherently pretextual. Irvin even states that "[t]he argument directly above that established Plaintiff has a *Prema* (sic) *Facie* case for retaliation applies here as well." (Pl.'s Resp. Defs.' Mot. Summ. J. 23). The law is clear, however, that a plaintiff employee must present evidence addressing the employer's proffered non-discriminatory reasons for the employment decision, and cannot merely insist that because there was differential treatment, any reason presented *must* be pretextual. Irvin has presented no evidence from which a jury could infer that he was transferred for a discriminatory reason or that BGPD's reliance on his performance records or on the Commonwealth Attorney's request was pretextual.[7]

---

[7] Irvin attempts to argue that because other members of the CID were not placed on a PIP and he, the only African American, was, then pretext can be inferred. (Pl.'s Resp. Defs.' Mot. Summ. J. 24). He attempts to fill this gap by reference to audio recordings which have not been made available for the Court's review but would apparently "be put on a disc and/or flash drive for trial purposes." (Pl.'s Resp. Defs.' Mot. Summ. J. 24 n.51). No attempt was made to establish the contents of these recordings through an affidavit or a written transcript. To reach a trial, Irvin must first clear the summary judgment hurdle, and he cannot do so by alluding in a footnote to evidence not in the record. Based on the uncontroverted evidence before the court, the only inference supported by the record is that Irvin was the only officer with performance issues and was therefore the only officer who required a PIP. Additionally, Irvin essentially contends that the Commonwealth Attorney's affidavit is untruthful, again citing an audio recording which is not in the record. (Pl.'s Resp. Defs.' Mot. Summ. J. 11). Irvin may question the Commonwealth Attorney's reasons for the request regarding his case assignments, but without any form of record evidence, his questions cannot establish the requirement of pretext.

To the extent Irvin attempts to argue that this is a "mixed-motive" case, he has presented no evidence from which a jury could infer that race was a *motivating* factor in any adverse employment decision. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 711 (6th Cir. 2006) ("[A] plaintiff [may] raise a mixed-motive Title VII claim by 'demonstrat[ing] that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.'" (third alteration in original) (quoting 42 U.S.C. § 2000e-2(m))). This lack of evidence is only highlighted by the fact that the individual within BGPD making the allegedly adverse transfer decision, Delaney, is himself African American. (Am. Compl. ¶ 11).

In sum, BGPD has shown that Irvin was placed on a PIP and transferred out of the CID due solely to performance related difficulties and an external request from the Commonwealth Attorney's Office. (Defs.' Mot. Summ. J. Ex. O, at 1). Even if the PIP was unusually long, the uncontroverted evidence indicates that the lengthy placement was an attempt by BGPD to help Irvin be successful. (Delaney Dep. 69:2-7). Irvin has presented no evidence from which a jury could infer that BGPD's proffered reasons are not based in fact, did not actually motivate the decision, or were an insufficient basis for the decision. Accordingly, summary judgment must be granted on the issue of retaliation.

### C. <u>Racial Discrimination Claims</u>

Irvin next brings identical racial discrimination claims pursuant to the KCRA, KRS 344.040 and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, arguing that "Plaintiff's race was a substantial motivating factor in Defendant [BGPD's] adverse employment actions, and its ultimate decision to demote him. Defendant [BGPD] has unlawfully discriminated against Plaintiff because of his race . . . ." (Am. Compl. ¶¶ 34, 37). "Title VII . . . makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). "The language of the KCRA generally tracks the language of Title VII and, thus, should be

interpreted consonant with federal interpretation." *Jones v. Fluor Facility & Plant Servs., Inc.*, No. 1:21-CV-00151-GNS-HBB, 2026 WL 208628, at 4 (W.D. Ky. Jan. 27, 2026) (internal quotation marks omitted) (quoting *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 793 (6th Cir. 2000)). "Because courts interpret Title VII and the [KCRA] using the same standards, [Irvin's] claims will be analyzed together." *Id.* (citing *Wathen*, 115 F.3d at 403 n.5).

Discrimination claims come in a variety of forms, and each one involves different material facts. On the face of his Amended Complaint, Irvin appears to bring a claim for disparate treatment, which "is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race . . . ." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). In the pending motion and response, however, both parties appear to treat the claim as one alleging a hostile work environment, despite that term appearing nowhere in Count II or III. The difference between the two theories is not without consequence. A disparate treatment claim requires a discrete adverse employment decision which has some actual and unfavorable change in job status. *McNeal v. City of Blue Ash*, 117 F.4th 887, 899-900 (6th Cir. 2024). A hostile work environment claim, on the other hand, is "based on the cumulative effect of individual acts, many of which are not actionable on their own" as adverse employment decisions. *Id.* at 899 (citation omitted); *see also Fayette Cnty. Bd. of Educ. v. Mitchell*, No. 2023-CA-0743-MR, 2025 WL 1717110, at *3 (Ky. App. June 20, 2025) (discussing the practical consequences of alleging only one of either a disparate treatment claim or a hostile work environment claim under the KCRA). Despite this ambiguity, for the following reasons, neither theory prevails.

**1. *Hostile Work Environment***

As the Sixth Circuit recognized in *Strickland v. City of Detroit*, 995 F.3d 495 (6th Cir. 2021):

> To establish liability for a hostile work environment, a plaintiff must show that (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) that harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment; and (5) the employer knew or should have known about the harassment and failed to take appropriate remedial action.

*Id.* at 503. "On summary judgment, [the court] look[s] at the totality of the alleged race-based harassment to determine whether it was 'sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment.'" *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 512 (6th Cir. 2011)). "In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). "[T]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive . . . ." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citation omitted).

"Severe or pervasive" is a high bar. The workplace must be *permeated* with discriminatory intimidation, ridicule or insult. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). Conduct that is merely offensive is not actionable. *Id.* Neither is simple teasing or offhand comments. *Kubik v. Cent. Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 584 (6th Cir. 2017). Likewise, comments not directed at the plaintiff weigh against a finding of objective hostility. *Williams v. CSX Transp. Co.*, 533 F. App'x 637, 641 (6th Cir. 2013).

Construing the material facts in the light most favorable to Irvin, no reasonable jury could infer that he has established a prima facie case for a hostile work environment claim. As an initial matter, much like his claim of retaliation, Irvin's discussion of his discrimination claim is rife with factual assertions unsupported by any citation or reference to the evidentiary record. *See InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.").

In the Amended Complaint, Irvin discusses three possibly racially motivated occurrences. First in May 2020, the picture of a detective wearing a white mask which Irvin believed resembled a KKK mask was posted in a work group text thread. (Am. Compl. ¶ 15). Second, in August 2020, some detectives commented on mugshots of African American inmates saying they looked like they were "sweating grease." (Am. Compl. ¶ 13). Third, in January 2021, a detective posted explicit rap lyrics on a board in the office common area which were eventually removed. (Am. Compl. ¶ 17; Irvin Dep. 38:17-19).[8] Throughout his response, Irvin discusses other allegedly racially charged events including a comment about his hair style, jokes about African American names, and a reference to Black Lives Matter as a terrorist organization. (Pl.'s Resp. Defs.' Mot. Summ. J. 18). None of these occurrences were alleged in the Amended Complaint, or even generically alluded to in a catch-all allegation, and none of them are accompanied by record citations.

The remaining three occurrences are not severe or pervasive enough, even when considered together. Irvin never alleges that any of these occurrences were directed towards him personally, and indeed the context of each only supports an inference that they were *not* personally directed at him, weighing against a finding of objective hostility.[9] Additionally, these events took place over the course of seven months. Comments and harassing acts which are commonplace, ongoing, or continuing are more likely to support a finding that the discriminatory conduct is severe or pervasive. *Johnson v. Ford*

---

[8] In the Amended Complaint, Irvin makes reference to one more comment where "a member of the board" said they weren't sure he would "be a good fit because of his personality and they haven't had a black detective in 20 years." (Am. Compl. ¶ 14). Irvin reiterates this claim in his response but does so without citation to the record. (Pl.'s Resp. Defs.' Mot. Summ. J. 7). Irvin pointed to no evidence showing who made this statement, that the person was employed by BGPD, or that the statement was made.

[9] The mask picture was shared with a work group text thread of which Irvin was a part, but he was not named in the messages. (Defs.' Mot. Summ. J. Ex. C, at 458-67). The comments about "sweating grease" were in reference to African American inmates, and Irvin admitted that the statement did not name him personally. (Irvin Dep. 42:16-24). Finally, the offensive lyrics were hung up in a common area where Irvin could read them and while they contained racial slurs throughout, they did not name or reference Irvin. (Irvin Dep. 37:9-21; Defs.' Mot. Summ. J. Ex. C, at 471).

*Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021). By contrast, when isolated events of harassment are spread out over months, courts regularly find that there is no severe or pervasive hostility. *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 568 (6th Cir. 2021) (upholding a grant of summary judgment because five instances of sex-based harassment over a roughly fifteen-month period of time was not objectively hostile); *Burnett v. Tyco Corp.*, 203 F.3d 980, 984-85 (6th Cir. 2000) (holding that the occurrence of three sexually offensive remarks by the plaintiff's personnel manager spread out at the beginning and at the end of a six-month period were not commonplace, ongoing, or continuing and therefore not pervasive discriminatory conduct); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (reversing a jury verdict although the plaintiff alleged various discriminatory comments made consistently over a four-month period, because viewed under the totality of the circumstances, the comments were merely offensive and most were not directed at the plaintiff).

There was no physical element to the harassment, none of the comments or jokes were directed at Irvin, and each occurrence was separated by months without any other instances of claimed inappropriate behavior. While no doubt the jokes and comments were offensive and inappropriate for the workplace, "Title VII was not designed to purge the workplace of vulgarity." *Id.* (internal quotation marks omitted) (citation omitted). Even considering the statements not alleged anywhere in the Amended Complaint, there would still not be enough evidence in the record to create a genuine issue of fact for a jury to decide. Regarding the comment that "Black Lives Matter is an organization run by terrorists" and the enacting of a comedy skit making fun of African American names, Irvin was not named or referenced. (Irvin Dep. 42:6-11, 43:14-18). In the several months during which these events took place, there was only a single comment directed at Irvin regarding his hair. (Irvin Dep. 44:17-46:1). Even assuming that comment was racially motivated, it occurred once, and was not part of a pattern of racial harassment. (Irvin Dep. 45:1-24). Furthermore, considered in totality, none of these events are any more severe than mere offensive conduct or offhand comments.

Even if Irvin were able to establish that the instances discussed above were severe or pervasive enough to create an objectively hostile environment, he cannot establish the final element of a hostile work environment claim, which "requires a plaintiff to demonstrate a basis for holding the employer liable for the harassing conduct of an employee's coworkers." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013). Irvin must show that BGPD's response to his coworker harassment complaints "manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins*, 517 F.3d at 338 (citation omitted).

Irvin's assertions that BGPD did not launch a prompt investigation are unsupported by the record. His attempt to characterize BGPD's response as simply a "check-the-box" investigation is likewise disingenuous. Not only did BGPD interview every member of the CID regarding the most severe of the reported conduct—the mask picture and the posted lyrics containing racial slurs—but the offending detectives were suspended for five days without pay and were kept on modified duty until the completion of remedial training and counseling. (Defs.' Mot. Summ. J. Ex. C, at 472; Defs.' Mot. Summ. J. Ex. E, at 1; Defs.' Mot. Summ. J. Ex. H, at 1; Defs.' Mot. Summ. J. Ex. J, at 1). In particular, Johnson, the detective who posted the rap lyrics, was warned that future violations may result in his termination. (Defs.' Mot. Summ. J. Ex. J, at 1). The comment about Irvin's hair was also investigated though it was determined that the comment was not offensive, was intended to be "jovial," and no punishment was given. (Defs.' Mot. Summ. J. Ex. C, at 62, 175). No jury could reasonably infer that BGPD was simply going through the motions of an investigation and failed to properly address the problem, especially given that after these punishments were doled out in early 2021, the offensive behavior apparently stopped entirely. "Generally, a response is adequate if it is reasonably calculated to end the harassment." *Waldo*, 726 F.3d at 814 (citation omitted). Irvin cites no record evidence creating an issue of fact that BGPD's response was not reasonably calculated to end, and effectively ended, the harassment. At most, the jokes regarding inmates "sweating grease" were left

uninvestigated but it is not clear, and Irvin cites no evidence, that these comments were reported or that BGPD had any reason to know they were made.

To the extent that the Amended Complaint alleges a hostile work environment, no reasonable jury could infer that he has established a prima facie case, and summary judgment must be granted.

**2. *Disparate Treatment***

When using circumstantial evidence, disparate treatment claims follow the *McDonnell Douglas* analytical framework in the same way that retaliation claims do. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016). Because Irvin relies on the same adverse employment actions for the basis of his disparate treatment claim as he does for his retaliation claim, summary judgment can be similarly granted. (Pl.'s Resp. Defs.' Mot. Summ. J. 19).

To establish a prima facie case of disparate treatment, Irvin must show that: "(1) [he was] a member of a protected class, (2) [was] subject to an adverse employment action, (3) [was] qualified for the position, and (4) [was] replaced by a person outside the protected class or treated differently than similarly situated nonminority employees." *Tennial*, 840 F.3d at 302 (citation omitted). Just as in a retaliation claim, under the *McDonnell Douglas* framework, once the prima facie case of disparate treatment has been established, the defendant employer must articulate a legitimate non-discriminatory reason for its actions. *McDonnell Douglas Corp.*, 411 U.S. at 802. After this articulation, the burden shifts again and the defendant must prove that the reason offered is "pretext designed to mask discrimination." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citation omitted).

The only employment actions both alleged in the Amended Complaint and discussed in the record which may qualify as adverse are Irvin's transfer from the CID back to patrol and the associated

PIP.[10] (Am. Compl. ¶¶ 18-19). Assuming that Irvin truly intends to bring a disparate treatment claim, he has not established his prima facie case. Even assuming he could do so, BGPD has articulated a legitimate, non-discriminatory reason for its actions. (Defs.' Mot. Summ. J. 22-23). BGPD has established that Irvin was reassigned to patrol because the local prosecutor requested that he no longer be assigned to investigate cases prosecuted by that office. (Bumgarner Aff. ¶ 4). That reason is no less legitimate or non-discriminatory in the disparate treatment context than it is in the retaliation context. Just as Irvin has not shown pretext in the retaliation context, he has not established pretext regarding disparate treatment, and there is no evidence that the prosecutor's request was somehow pretextual. Therefore, to the extent that Irvin is alleging a disparate treatment claim, summary judgment must be granted.

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (DN 31) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

**Greg N. Stivers, Judge**
**United States District Court**
November 23, 2026

cc: counsel of record

[10] Irvin lists several alleged adverse employment actions in his response, but he does so without citation to the record. (Pl.'s Resp. Defs.' Mot. Summ. J. 19). Of the listed occurrences, not being allowed to train new recruits and being passed up for promotion are not alleged in the Amended Complaint and are therefore not properly before the court. The remaining occurrences—not being allowed to perform sniper training, being *required* to train, and being harassed about his timecard—have already been determined not to be adverse employment actions.